FILED

UNITED STATES DISTRICT COURT DISTRICT COURT
MIDDLE DISTRICT OF LA

MIDDLE DISTRICT OF LOUISIANA

2003 AUG 27   A  9: 28

EDLA #04-561 "R"

UNITED STATES OF AMERICA
*EX. REL.* STEVEN J. GREENE

vs.

TENET HEALTHCARE CORPORATION,
KENNER REGIONAL MEDICAL CENTER, and
MEMORIAL MEDICAL CENTER

C. A. NO.
BY DEPUTY CLERK

03-646-A-M-3

**FILED UNDER SEAL
PURSUANT TO 31 U.S.C.
§ 3730(b)(2)**

## *QUI TAM* COMPLAINT FOR DAMAGES UNDER THE
## FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

Plaintiff United States of America (the "United States"), by and through *qui tam* relator

Steven J. Greene ("Greene"), brings this action against defendants Tenet Healthcare Corporation

("Tenet"), Kenner Regional Medical Center ("Kenner Regional") (formerly known as St. Jude

Medical Center ("SJMC")), and Memorial Medical Center ("Memorial") (formerly known as

Mercy + Baptist Medical Center ("Mercy + Baptist")) (collectively the "defendants"), to recover

treble damages, civil penalties and other relief under the False Claims Act, 31 U.S.C. §§ 3729, *et*

*seq.*, and respectfully shows as follows:

### I.   NATURE OF ACTION

1.       This is a *qui tam* action to recover damages and civil penalties on behalf of

the United States arising from false or fraudulent Medicare and Medicaid reimbursement claims

submitted by or caused to be submitted by defendants in violation of the False Claims Act

("FCA"), 31 U.S.C. §§ 3729, *et seq.*

2.       The violations of the FCA are based upon defendants' violations of the "Federal

| INITIALS | DOCKET# |
|----------|---------|
|          |    1    |

JS! Waiver

Anti-kickback Statute," 42 U.S.C. § 1320a-7b(b), and the self-referral statutes, commonly known

as the "Stark Statute" or "Stark I" and "Stark II," 42 U.S.C. § 1395nn.

3.    The physicians to whom defendants provided illegal remuneration and kickbacks

and with whom defendants entered into illegal financial relationships referred large volumes of

patients, including Medicare and Medicaid patients, to Kenner Regional and Memorial, hospitals

owned by TENET, in violation of federal law.  Defendants, in turn, submitted claims to Medicare

and Medicaid and obtained substantial sums of money from the United States and the State of

Louisiana.  Under the FCA, 31 U.S.C. § 3729(a)(1), such claims were false and/or fraudulent

because defendants had no entitlement to payment for services provided on referrals from such

physicians.

4.    Defendants also violated the FCA, 31 U.S.C. § 3729(a)(2), by making

or causing to be made false statements when submitting these claims for payment to Medicare and

Medicaid.  Defendants falsely certified the claims and statements were "true" and/or "correct,"

and, as such, were entitled to payment.

5.    To conceal their unlawful conduct and to avoid refunding payments made on the

false claims, defendants also falsely certified, in violation of the FCA, 31 U.S.C. § 3729(a)(7), that

the services identified in annual cost reports were provided in compliance with federal law,

including the prohibitions against kickbacks, illegal remuneration to physicians, and improper

financial relationships with physicians.  The false certifications, made with each annual cost report

submitted to the United States, were part of defendants' unlawful scheme to defraud Medicare and

Medicaid.

6.    Defendants submitted false claims and failed to take timely action to stop the

improper billing of Medicare and Medicaid and notify the United States of the illegal scheme. This was true even though Tenet was operating under a Corporate Integrity Agreement with the United States Department of Health and Human Services which required Tenet to report any improper conduct between 1994 and 1998.

7.    The false claims consist of:

a.    **Tainted Claims** – All claims filed with the United States that were the product of prohibited patient referrals to Kenner Regional and Memorial to whom defendants paid remuneration in violation of the fraud and abuse anti-kickback and prohibited referral provisions of 42 U.S.C. § 13200-7b(b) and 42 U.S.C. § 1395nn(a)(1). Kenner Regional and Memorial engaged in the systematic filing of claims derived from payments being made, in whole or in part, for such illegal referrals at the expense of the United States; each claim was "tainted" by illegal kickback arrangements and prohibited referrals; and

b.    **False Certifications** – All claims filed by Kenner Regional and Memorial with the United States agencies for payment explicitly and implicitly which failed to comport with the certifications contained in HCFA 2552 (commonly known as a "Hospital Cost Report"), which constitute false certifications by defendants that they did not violate the above-referenced statutes.

## II.    CONDITIONS PRECEDENT

8.    Pursuant to the FCA, 31 U.S.C. § 3730(b)(2), this Complaint has been filed *in camera* and under seal. Further, the relator Greene has provided a written disclosure statement to the Attorney General of the United States and to the United States Attorney for the Middle District of Louisiana of substantially all material evidence and information that he possesses. The

-3-

disclosure statement is supported by material evidence known to Greene establishing the existence

of the false claims on which this action is based. Inasmuch as the disclosure statement includes

attorney-client communications, constitutes work product of Greene's attorneys, and/or is

submitted to the Attorney General and the United States Attorney in their capacity as potential

co-counsel in this litigation, Greene understands and intends for this disclosure to be privileged

and confidential.

      9.     All other conditions precedent to the initiation of this action have occurred, or

have been performed, waived or excused.

### III.   JURISDICTION

      10.    This Court has subject matter jurisdiction to entertain this action under 28 U.S.C.

§§ 1331 and 1345. The Court may exercise personal jurisdiction over the defendants pursuant to

31 U.S.C. § 3732(a), which provides for jurisdiction in any judicial district in which the defendant,

or in the case multiple defendants, in which one defendant resides, transacts business, or in which

the act proscribed by 31 U.S.C. § 3729 occurred.

      11.    Further, this Court has jurisdiction over this case pursuant to 28 U.S.C. §1345,

which provides the district courts with original jurisdiction of all civil actions commenced by the

United States.

### IV.   VENUE

      12.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C.

§ 1391(b) and (c) because, upon information and belief, the Medicare and/or Medicaid claims

alleged herein were sent to, received in, processed in, and/or paid in whole and/or in part within

the Middle District of Louisiana.

## V.   PARTIES

13.   Plaintiff is the United States *ex rel.* Greene.  At all times material hereto, the United States funds the provision of medical care for eligible citizens through Medicare and federal Medicaid funds, acting through the Health Care Financing Administration ("HCFA"), within the United States Department of Health and Human Services ("HHS") as agencies and instrumentalities of the United States.

14.   Greene, a citizen of the United States and a resident of the State of Florida, is suing on behalf of and in the name of the United States.  Greene was the Chief Executive Officer of defendant, Kenner Regional, from June 1994 to October 1997 and an employee of defendant, Tenet.  As Chief Executive Officer, Greene was responsible for, *inter alia*, the day-to-day operations of Kenner Regional.  Greene also communicated the hospital's policies, strategies, and major system wide initiatives to operating executives and held them accountable for implementation.  Further, Greene worked with executives of Tenet and on system strategy and operations, was kept informed of performance issues relating to Tenet's operations at Kenner Regional and Memorial.  Greene obtained direct knowledge, information and belief that Tenet, by and through Kenner Regional and Memorial, knowingly paid physicians excessive remuneration for services above the fair market value for such services.  The excessive remuneration was directly based on the volume and value of referrals from such physicians in a scheme designed to induce those physicians to make illegal referrals to Kenner Regional and Memorial.  This conduct "tainted" all claims submitted by Kenner Regional and Memorial to Medicare and Medicaid that were the product of the prohibited referrals and relationships.  Greene has personal, direct and

-5-

independent knowledge of the allegations contained herein, and therefore is the "original source" as required under the FCA, 31 U.S.C. § 3729, *et seq.*

15.     Defendant Tenet is an investor-owned healthcare services company in the United States.  Tenet is a for-profit corporation organized under the laws of the State of Nevada.  Tenet's principal place of business is located at 3820 State Street, Santa Barbara, California 93105.  Tenet is one of the largest hospital chains in the United States.

16.     As of May 31, 2002, Tenet and its subsidiaries owned or operated 116 acute care hospitals with 28,667 licensed beds in 17 states, as well as one in Europe.  The acute care hospitals serve as cornerstones to vast regional health care delivery networks.  These regional networks include specialty hospitals, outpatient surgery centers, home health agencies, rehabilitation hospitals, psychiatric hospitals, health maintenance organizations ("HMOs"), and long-term care facilities.

17.     Tenet's related healthcare facilities included a small number of rehabilitation hospitals, specialty hospitals, long-term care facilities, a psychiatric facility and medical office buildings located on the same campus as or nearby its general hospitals, physician practices and various ancillary healthcare businesses, including outpatient surgery centers, home healthcare agencies, occupational and rural healthcare clinics and health maintenance organizations.

18.     Each of Tenet's general hospitals offers acute care services, operating and recovery rooms, radiology services, respiratory therapy services, pharmacies and clinical laboratories, and most offer intensive care, critical care and/or coronary care units, as well as physical therapy, orthopedic, oncology and outpatient services.  A number of the hospitals also offer tertiary care services, such as open-heart surgery, neonatal intensive care and neuroscience.

19.     Each of Tenet's facilities is fully accredited by the Joint Commission on Accreditation of Healthcare Organizations, the Commission on Accreditation of Rehabilitation Facilities (in the case of rehabilitation hospitals), the American Osteopathic Association (in the case of two hospitals) and other appropriate accreditation agencies (except for one small hospital which has not sought to be accredited, but is eligible for accreditation). With such accreditation, Tenet's hospitals are eligible to participate in the Medicare and Medicaid Programs.

20.     Tenet receives payments for patient care from private insurance carriers, federal Medicare programs for elderly patients and patients with disabilities, HMOs, preferred provider organizations ("PPOs"), federal Medicaid funds, and state Medicaid programs.

21.     All of Tenet's operations are conducted through its subsidiaries. As of May 31, 2002, Tenet's subsidiaries operated 116 domestic general hospitals with 28,667 licensed beds serving urban and rural communities in 17 states.

22.     Defendant Kenner Regional is located in New Orleans, Louisiana, and offers inpatient and outpatient acute care, occupational medicine and psychiatric services. Kenner Regional is fully accredited by the Joint Commission on Accreditation of Healthcare Organizations and is licensed by the State of Louisiana. Kenner Regional  was formerly owned by Lifemark Hospitals of Louisiana Inc., then owned by its successor company, American Medical International, and is now wholly owned by Tenet.

23.     Defendant Memorial is located in New Orleans, Louisiana, and is wholly owned by Tenet. In 1994, Southern Baptist Hospital and Mercy Hospital merged. In 1996, Mercy and Baptist Medical Center became part of Tenet and was renamed Memorial. Memorial offers inpatient and outpatient acute care and other medical services. Memorial is fully accredited by the

-7-

Joint Commission on Accreditation of Healthcare Organizations and is licensed by the State of Louisiana.

24.    At all times material, Tenet acted by and through its agents, employees and other defendants herein, and the acts of its agents and employees were within the scope of their agency and employment.  All unlawful policies and practices alleged in this Complaint were, on information and belief, established or ratified at the highest corporate levels of Tenet.  Given the relationships between and among them, at all times material hereto, all defendants acted jointly, collectively, in combination and conspiracy with each other, and with each other's knowledge or consent, in order to collectively share in the profits and benefits derived from their illegal scheme.

## VI.    THE LAW

### A.    The False Claims Act

25.    The FCA, in pertinent part, provides:

> (a)    Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; . . . or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government, . . .

> \* \* \* \* \*

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . .



(b)    For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

### B.    The Anti-kickback Statute

26.    The Federal Anti-kickback Statute prohibits: (1) the solicitation or receipt of remuneration in return for referrals of Medicare and Medicaid patients; and (2) the offer or payment of remuneration to induce such referrals.  42 U.S.C. § 1320a-7b(b).

27.    The Federal Anti-kickback Statute arose out of congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of the program from these difficult to detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.  First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

28.    The Federal Anti-kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for

federally-funded medical services, including services provided under the Medicare, Medicaid, and (as of January 1, 1997), TriCare programs. In pertinent part, the statute states:

(a) Illegal remuneration

    (1)    whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –

        (A)    in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

        (B)    in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

    shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

    (2)    whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

        (A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

        (B)    to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

> shall be guilty of a felony and upon conviction thereof, shall be fined
> not more than $25,000 or imprisoned for not more than five years, or
> both.

42 U.S.C. § 1320a-7b(b). Violation of the statute can also subject the perpetrator to exclusion

from participation in federal health care programs, and, effective August 6, 1997, civil monetary

penalties of $50,000 per violation and three times the amount of remuneration paid.

42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

### C.    The Stark Statute

29.    A provision of the Social Security Act, 42 U.S.C. § 1395nn, commonly known as

the "Stark Statute," prohibits a hospital (or other entity providing healthcare items or services)

from submitting Medicare claims for payment based on patient referrals from physicians having an

improper "financial relationship" with the hospital. "Financial relationship" is broadly defined to

include any ownership or investment interest or compensation arrangement pursuant to which a

physician receives remuneration from the provider at issue. The statute's exceptions then identify

specific transactions that will not trigger its referral and billing prohibitions. The regulations

implementing 42 U.S.C. § 1395nn require that any entity collecting payment for a healthcare

service "performed under a prohibited referral must refund all collected amounts on a timely

basis." 42 C.F.R. § 411.353.

30.    The Stark Statute establishes that the providers cannot submit claims for

reimbursement to the United States for services rendered to individuals referred by physicians

who have improper financial relationships with the providers of the items or services. In enacting

the statute, Congress found that improper financial relationships between physicians and entities

to whom they refer patients can compromise the physician's professional judgment as to whether

an item or service is medically necessary, safe, effective, and of good quality. Congress relied upon various academic studies consistently showing that physicians who had financial relationships with medical service providers used more of those providers' services than similarly situated physicians who did not have such relationships. The statute was designated specifically to reduce the loss suffered by the Medicare Program due to such increased questionable utilization of services.

31.      Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

32.      Stark I prohibits physicians from referring Medicare patients to an entity for clinical laboratory services if the referring physician and the entity have nonexempt "financial relationship," either ownership or investment interest in the entity or a compensation arrangement with such an entity. Section 1395nn(a)(1)(B) further prohibits an entity from presenting or causing a Medicare claim to be presented for services furnished pursuant to a prohibited referral. Stark I in Section 1395nn(g)(1) expressly prohibits payment of Medicare claims for services rendered in violation of its provisions.

33.      In 1993, Congress extended the Stark I to referrals for ten additional designated health services. *See* Omnibus Budget Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152. 21. As of January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the following

-12-

ten additional "designated health services": (1) inpatient and outpatient hospital services; (2)

physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and

supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients,

equipment and supplies; (8) prosthetics, orthotics and prosthetic devices and supplies; (9)

outpatient prescription drugs; and (10) home health services. *See* 42 U.S.C. § 1395nn(h)(6).

34.     Stark II prohibits physicians from referring Medicare patients to an entity for

certain "designated health services," including inpatient and outpatient hospital services, where the

referring physician has a nonexempt "financial relationship" with such entity.  It also prohibits an

entity from presenting or causing a Medicare claim to be presented for services furnished pursuant

to a prohibited referral and expressly bars payment of Medicare claims for services rendered in

violation of its provisions.  42 U.S.C. § 1395nn(a)(1), (g)(1).

35.     The Stark Statute, in pertinent part, provides:

(a)     Prohibition of certain referrals

(1)     In general

Except as provided in subsection (b) of this section, if a physician (or
an immediate family member of such physician) has a financial
relationship with an entity specified in paragraph (2), then -

(A) the physician may not make a referral to the entity
for the furnishing of designated health services for
which payment otherwise may be made under this
subchapter, and

(B)  the entity may not present or cause to be
presented a claim under this subchapter or bill to any
individual, third party payor, or other entity for
designated health services furnished pursuant to a
referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn (emphasis added).

36.     Compensation paid to a referring physician serving as a consultant to a hospital may fall within an exception to the statute but only if the contract: (1) specifies the services covered; (2) covers all the services to be provided by the physician; and (3) the aggregate of such services is both reasonable and necessary for the legitimate business purposes of the hospital and is consistent with fair market value for services actually rendered, not taking into account the volume or value of the referrals or other business generated between the parties. 42 U.S.C. § 1395nn(e)(3).

## VII.    THE FEDERAL HEALTHCARE PROGRAMS

### A.    The Medicare Program

37.     In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Most hospitals, including Kenner Regional and Memorial, derive a substantial portion of their revenue from the Medicare Program.

38.     During the time period relevant to this complaint, Medicare paid for outpatient hospital services on the basis of the provider's reported costs.

39.     HHS is responsible for the administration and supervision of the Medicare Program. HCFA, an agency of HHS, is directly responsible for the administration of the Medicare Program.

-14-

40.    To assist in the administration of Medicare Part A, HCFA contracts with "fiscal intermediaries" ("FIs"). 42 U.S.C. § 1395h. FIs typically are insurance companies that provide a variety of services, including processing and paying claims and auditing cost reports.

41.    Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64.

42.    Hospitals submit patient-specific claims for interim payments on Form HCFA UB-92.

43.    During the course of their fiscal year, hospitals submit claims to their assigned Fis for reimbursement for the hospital stays for Medicare beneficiaries that they treat. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals receive payments on these claims. Within a specified time after the end of the hospital's fiscal year, the hospital must submit its cost report to its FI so that the FI can make year-end adjustments to the amounts paid to the hospital, as needed. 42 C.F.R. § 413.20(b). Cost reports are the final claim that a provider submits to its fiscal intermediary for items and services rendered to Medicare beneficiaries.

44.    Cost reports contain specific financial data relating to the hospital including reimbursable costs that the hospital expended to care for Medicare patients. Based on the cost report, Medicare determines whether the hospital is entitled to monies from Medicare in addition to the payments made during the year, or needs to reimburse any overpayments received during the year. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

45.    As a prerequisite to payment by Medicare, HCFA requires hospitals to submit

-15-

annually a Form HCFA-2552, more commonly known as the Hospital Cost Report. Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

46.    At all times relevant to this Complaint, Kenner Regional and Memorial were required to submit cost reports to their FIs.

47.    After the end of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; 42 C.F.R. § 405.1801(b)(1). Hence, Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

48.    Under the rules applicable at all times relevant to this Complaint, Medicare has the right to make retroactive adjustments to Hospital Cost Reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64(f).

49.    Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the hospital or a responsible designee of the administrator. 42 C.F.R. § 413.24(f)(4).

50.    HCFA requires every hospital to certify that to the best of its knowledge and belief the filed cost report is: (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate, (2) correct, *i.e.*, that the hospital is entitled to reimbursement for the reported costs in accordance with applicable instructions, and (3) complete. *i.e.*, that the hospital cost

report is based upon all of the provider's cost information pertaining to the determination of reasonable cost.

51.    Each cost report prepared and submitted by Kenner Regional and Memorial included a certification signed by the chief administrator or a responsible designee of the administrator, which stated in pertinent part:

> To the best of my knowledge and belief, [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

HCFA Form 2552-81. The cost report form also contained an explicit reminder to the provider that "intentional misrepresentation or falsification of any information contained in this cost report may be punishable by fine and or imprisonment under federal law."

52.    Each cost report prepared and submitted by Kenner Regional and Memorial, after September 30, 1994, contained the following additional sentence:

> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

HCFA Form 2552-94.

53.    Each cost report prepared and submitted by Kenner Regional and Memorial during 1996 and thereafter contained the following additional notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

-17-

HCFA Form 2552-96.

54.    Once the Stark Statute became effective, providers certified on the Form HCFA

2552 that the services provided in the in compliance with the Stark Statute.

55.    A hospital is required to disclose all known errors and claims for Medicare

reimbursement (including its cost reports) to its fiscal intermediary.  Section 13201-7b(a)(3)

creates a duty to disclose known errors in cost reports:

> Whoever .   .    . having knowledge of the occurrence of any event
> affecting (A) his initial or continued right to any such benefit or
> payment .   .   . conceals or fails to disclose such event with an intent
> fraudulently to secure such benefit or payment either in a greater
> amount or quantity than is due or when no such benefit or payment is
> authorized .   .   . shall in the case of such a .   .   . concealment or
> failure .   .   . be guilty of a felony.

56.    All defendants are and were familiar with the law and regulations governing the

Medicare Program, including requirements relating to the completion of cost reports.

57.    HCFA Form 2552 and HCFA's instructions for completing that cost report form

require hospitals to collect and record cost data and patient utilization statistics in a manner

designed to determine the true, reasonable, and allowable cost that the hospital incurred to

provide care to Medicare beneficiaries during the period covered by the report.

58.    Shortly after a hospital submits a cost report, the FI makes a tentative settlement

and payment on the cost report as submitted.

59.    HCFA conditions the payment of Medicare funds during the year and at year-end

on the hospital's certification that the statements contained in the cost report are true.  42 C.F.R.

§§ 413.20(e), 413.224(f).

-18-

**B.    The Medicaid Program**

60.    Medicaid is the nation's major public source of financing of health insurance for low-income families and long-term care services for the elderly and disabled.  42 U.S.C. §§ 1395-1395qqq.  Medicaid is jointly funded by the federal and state governments.  The Medicare Program is administered by the Center for Medicare and Medicaid Services ("CMS"), which is under the authority of the Secretary of HHS.

61.    The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation ("FFP").  42 U.S.C. §§ 1396, *et seq.*

62.    Each state's Medicaid program must cover hospital services.  42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

63.    In many states, provider hospitals participating in the Medicaid program file annual cost reports with the state's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports.

64.    In some states, provider hospitals participating in the Medicaid program file a copy of their Medicare cost report with the Medicaid program, which is then used by Medicaid or its intermediaries to calculate Medicaid reimbursement.  In other states, provider hospitals file a separate Medicaid cost report.

65.    Providers incorporate the same type of financial data in their Medicaid cost reports as contained in their Medicare cost reports, and include data concerning the number of Medicaid patient days at a given facility.

66.    Typically, each state requiring the submission of a Medicaid cost report also

requires an authorized agent of the provider to expressly certify that the information and data on the cost report is true and correct.

67.     Individual Medicaid programs use the Medicaid patient data in the cost report to determine the reimbursement to which the facility is entitled.  The facility receives a proportion of its costs equal to the proportion of Medicaid patients in the facility.

68.     Where a provider submits the Medicare cost report with false or incorrect data or information to Medicaid, this necessarily causes the submission of false or incorrect data or information to the state Medicaid program, and the false certification on the Medicare cost report necessarily causes a false certification to Medicaid as well.

69.     Where a provider submits a Medicaid cost report containing the same false or incorrect information from the Medicare cost report, false statements and false claims for reimbursement are made to Medicaid.

## VIII.    DEFENDANTS' ILLEGAL SCHEME

70.     Defendants agreed amongst themselves to an illegal arrangement whereby Tenet offered and the doctors accepted remuneration, in whole or in part, in exchange for referrals of patients from Louisiana State University Medical Center - New Orleans ("LSUMC") to Kenner Regional and Memorial, both owned by Tenet, with the understanding and intent that the United States would be billed for medical services rendered to such individuals.  In fact: (1) such referrals were made; (2) the illegal referral fees or kickbacks were paid by Tenet and accepted by the doctors; (3) the United States was billed for services rendered to the referred individuals; and (4) Tenet's hospitals were paid by the United States for such services.

71.     LSUMC provides education, research, patient care services in the New Orleans area. The Board of Supervisors for the LSUMC ("LSU Board of Supervisors") functions as the management board for all institutions under its control. *See* LSA-R.S. 17:3215, LSA - R.S. 17:1519(4),(5) and (6) and 17:1519.1.

72.     LSUMC entered into affiliation agreements with Tenet establishing teaching and residency programs at Kenner Regional and Memorial. LSUMC was attractive to Tenet because of the expectation that doctors, such as those involved with LSUMC's Faculty Group Practice Plan, refer patients to Kenner Regional and Memorial. A financial linchpin to Tenet's affiliation with LSUMC was its agreement to finance the $25 million Stanley S. Scott Cancer Center on the university's campus. Tenet's strategy was to obtain tremendous patient referrals from LSUMC to Tenet's hospitals -- Kenner Regional and Memorial – so that Tenet's revenues would dramatically increase.

73.     Tenet invested significant sums of money for LSUMC to relocate clinical programs to Kenner Regional and, similarly, invested significant sums of money to implement, establish and relocate clinical programs to Memorial, including monies to renovate the facilities. Tenet made arrangements for LSUMC's practice groups and physicians, to become affiliated with Kenner Regional and Memorial. Further, Tenet spent significant sums of money in capital expenditures to support the relocation of LSUMC's private practice volume to Kenner Regional, including building out offices for LSUMC's physicians in medical buildings adjacent to Kenner Regional in which the leases for use of said offices was at below market rent.

74.     Prior to entering into these affiliation agreements, Tenet performed extensive,

internal financial analyses, projections and validations to determine the value and volume of referrals which could be generated from these arrangements and anticipated patient referrals from LSUMC to Kenner Regional and Memorial. The analyses and projections were broken down by, *inter alia*, practice group, the number of patient admissions, gross revenue, net revenue, etc., and were done for both Kenner Regional and Memorial. Tenet also obtained combined projections for both Kenner Regional and Memorial. The analyses and projections were used to determine the effect that the LSUMC-Tenet affiliation would have on patient referrals from LSUMC to Kenner Regional and Memorial and the bottom-line effect on the hospitals' financial performance.

75.    For example, projections for Kenner Regional for the period 1997 through 2001 showed an anticipated increase in gross total patient revenue from $9.3 million to $30.4 million; and an anticipated increase in net revenue from $4.8 million to $13.1 million. Projections for Memorial the period 1997 through 2001 showed an anticipated increase in gross total patient revenue from $30.6million to $63.8 million; and an anticipated increase in net revenue from $15.2 million to $26 million.

76.    Tenet's Business Plan for fiscal year 1996 also contained detailed analyses and projections to determine the effect that the LSUMC-Tenet affiliation would have on patient referrals from LSUMC to Kenner Regional and the bottom-line effect on Kenner Regional's financial performance. According to Tenet's Business Plan for fiscal year 1996 for Kenner Regional:

> In order to accurately determine the impact which could be obtained from the partnership between Tenet and LSU at SJMC, a study was undertaken to project the number of admissions and census potential which could be gained from an affiliation of the two parties and

utilization of SJMC as the primary inpatient site for the LSU faculty.

77.   Tenet's Business Plan for fiscal year 1996 further provided that:

The results of the study are enclosed within this document and present the following:

o   LSU Department and Section business plan components for each for the first three years of such a consolidated effort.

o   The information found within the individual business plan components were developed based upon:

* * *

•   Evaluation of practice plan volumes by medical school section and department, including patient origin of current patient volume.

78.   Tenet's Business Plan for fiscal year 1996 "yielded an incremental projection of admissions, patient days, length of stay, and average daily census for the LSU component of patients which could be housed at the SJMC facility. . . ."

79.   Tenet's Business Plan for fiscal year 1996 also considered, among other things, physician recruitment and directorship expenses, expenses for hospital residents, resident supervision, and fellows, and a medical office building expense of $1 million in needed upgrades.

80.   The remaining components of Tenet's Business Plan for fiscal year 1996 included a summary of admission projections by LSU department and section, individual business plan components by department and section, and the pro forma for this component of the total SJMC business plan.

81.   In addition to the internal financial projections and analyses performed by

-23-

Tenet, Tenet retained an outside accounting firm, KPMG Peat Marwick LLP, to also determine

the value and volume of referrals which could be generated from its arrangements with LSUMC.

In April 1996, KPMG Peat Marwick issued a Final Report for Tenet, titled "Review of

Strategic/Financial Implications of the Proposed LSU Affiliation," which recited that:

> Tenet . . .and the LSU Faculty Group Practice are pursuing a long-term affiliation to strengthen their position within the greater New Orleans health care market . . .
>
> The key components of the long-term LSU/Tenet affiliation agreement" are as follows:
>
> The LSU FPG [Faculty Plan Group] will admit a significant majority of their private pay/Medicare patients to Tenet facilities. Kenner Regional Medical Center and Mercy + Baptist Medical Center will be the primary locations for these admissions.

82.    The KPMG Peat Marwick Final Report also stated that key components included

Tenet's funding of a negotiated number of resident supervisors at Kenner Regional and Memorial

and providing physicians with recruitment income guarantees.  The KPMG Peat Marwick Final

Report also contained extensive financial projections and analyses regarding patient transferability

from LSUMC practice groups to Kenner Regional and Memorial and concluded overall that the

LSUMC-Tenet arrangement would significantly increase the Earnings Before Interest, Taxes,

Depreciation, and Amortization ("EBITDA") for both Kenner Regional and Memorial.

83.    Tenet also designed business plans for Kenner Regional and Memorial based upon

its affiliation with LSUMC.  The focus of Tenet's business plans was to redirect significant patient

volume from LSUMC's various practice groups to Kenner Regional and Memorial, which, in

turn, would result in a significant increase in revenue for Tenet.

84.    In order to ensure that the physicians at LSUMC would refer patients to Kenner Regional and Memorial, Tenet embarked on a strategy of paying illegal remuneration and engaging in unlawful financial relationships with Kenner Regional and Memorial to pay physicians, both directly and through LSUMC, to induce patient referrals to Kenner Regional and Memorial. Kenner Regional and Memorial, in turn, billed for and collected significant sums of monies in reimbursement from Medicare and federal Medicaid payments.

85.    Tenet, by and through the actions of Kenner Regional and Memorial, provided the following unlawful inducements and kickbacks or caused unlawful inducements and kickbacks to be paid to physicians who were in a position to refer patients, and who did indeed refer significant numbers of patients to Kenner Regional and Memorial, and entered into prohibited relationships with such physicians.

a.    Tenet paid monies for physicians of LSUMC, which were disguised as fees for services under the rubric of "medical directorships." These purported medical directorships were at compensation levels far above fair market value for duties performed. For example, at the time, the fair market value for a medical directorship was approximately $150.00 per hour. Tenet paid far in excess of this amount for medical directorships, including a medical directorship in the Department of Orthopedics. The physicians who received these purported payments referred a substantial number of patients, including Medicare and Medicaid patients, to Kenner Regional and Memorial for outpatient services and inpatient stays, and encouraged other physicians at LSUMC to make similar referrals. Medicare and Medicaid ultimately paid Kenner Regional and Memorial for these referrals.

-25-

    b.  Tenet, by and through Kenner Regional and Memorial, increased the remuneration paid to physicians who referred a large number of patients for outpatient services and inpatient stays to Kenner Regional and Memorial in order to induce them to continue referring patients to the hospital.  For example, in a letter dated May 29, 1997, Robert D. D'Ambrosia, the Professor and Chairman of the Department of Orthopedics at LSUMC, wrote Greene, the Chief Executive Officer of Kenner Regional, and requested a $50,000 contract for Directorship of the Orthopaedic Oncology Service based upon the fact that there were more tumor patient referral cases from LSUMC to Kenner Regional than initially anticipated.  Similarly, in a letter dated May 29, 1997, Dr. D'Ambrosia wrote Greene and requested, *inter alia*, an increase of $50,000 in the Faculty Supervision Contract to purportedly cover the participation of a resident in the educational and patient care activities at Kenner Regional.  When an agreement could not be reached with Dr. D'Ambrosia, he brought this matter to the attention of Tenet.  As a result, Tenet agreed to pay Dr. D'Ambrosia far in excess of what he had requested, to wit, $346,456.26 x 2/3 for Faculty Supervision or Residents under the Orthopedics Residency Training Program.  At that time, the number of actual residents at Kenner Regional was significantly less than the number of residents upon which the compensation Tenet agreed to pay was based.

    c.  Tenet provided LSUMC physicians, including physicians with the Department of Orthopedics, with reduced rent, which was far below fair market value, for office space near Kenner Regional in facilities owned or operated by Tenet.  For example, Tenet rented office space to the Department of Orthopedics at approximately $10.00 per square foot, when the fair market value for similar Class A space was approximately $18.00 to $20.00 per square foot.

-26-

Tenet also provided LSUMC's physicians larger build-out allowances than was given to other tenants.

        d.    Tenet funded a number of physician income guarantees in order to recruit faculty physicians at Kenner Regional and Memorial, with the expectation and understanding that those physicians would refer their patients to Kenner Regional and Memorial.

86.    LSUMC's physicians were required to promptly provide the hospitals with documentation of all hours that services were performed. These time records were often incomplete, not provided and/or not timely submitted and hospital officials at Kenner Regional would regularly assist in the preparation of the time records for the physicians.

87.    The excessive remuneration paid directly and indirectly by Tenet are tantamount to kickbacks designed by Tenet to fraudulently induce illegal referrals which, in fact, did induce illegal referrals to Kenner Regional and Memorial. The illegal kickbacks and accepted by the doctors knowingly and intentionally structured by Tenet to appear as compensation for medical services and supervision provided by the doctors. In reality, the doctors were compensated far in excess of the prevailing industry rate for their services to the extent they actually provided such services. In fact, the doctors were compensated for referrals rather than for services actually rendered.

88.    As a result of the illicit arrangements and kickbacks, the physicians' referrals to Kenner Regional and Memorial dramatically increased.

89.    The illegal scheme created and employed by Tenet, of which the other defendants played an integral part, allowed Kenner Regional and Memorial to bill Medicare and Medicaid for referrals generated by the physicians.

90.    As alleged above, as a condition of their participation in the Medicare Program, defendants were required to certify in annual cost reports that the services identified therein were provided in compliance with the laws and regulations regarding the provision of healthcare services.  Thus, the United States' payment of Medicare claims is conditioned upon certification of compliance with the laws and regulations regarding the provision of healthcare services, including the Federal Anti-kickback Statute and the Stark Statute.

91.    Kenner Regional and Memorial submitted reimbursement claims for payment to the United States for services rendered to individuals who were referred to Kenner Regional and Memorial by doctors who received illegal kickbacks in violation of the above-referenced statutes. Kenner Regional and Memorial expressly certified compliance with the Federal Anti-kickback Statute and the Stark Statute upon submission of the Medicare reimbursement form.

92.    Kenner Regional and Memorial submitted annual Hospital Cost Reports, covering Fiscal Year 1996 through Fiscal Year 2002, and, upon information and belief, continuing to date, that falsely certified that the medical services identified therein had been provided in compliance with applicable laws and regulations.  All Hospital Cost Reports were submitted on behalf of Kenner Regional and Memorial and for the benefit of Defendants.

93.    In addition to express certification of compliance with federal law, Kenner Regional and Memorial implicitly certified compliance by submitting reimbursement forms to the United States for payment, which were paid.

94.    Moreover, defendants knowingly concealed, or failed to disclose, or caused others to fail to disclose material information in Medicare cost reports filed by Kenner Regional and Memorial in contravention of the hospital's certifications that each cost report "is a true,

-28-

correct, and complete report prepared from the books and records of the provider in accordance with applicable instructions," as required by federal law and regulation. 42 C.F.R. § 413.24(f)(4)(iv).

95.    Under a June 1994 Corporate Integrity Agreement entered into with the United States as part of the resolution of a previous False Claims Act case, Tenet has been required to submit annual Compliance Reports to the HHS identifying any unlawful conduct at any of its facilities. By failing to disclose the above matters in any of its annual compliance reports submitted to HHS, Tenet failed to abide by the Corporate Integrity Agreement.

96.    Defendants' false statements and omissions were material, inasmuch as reimbursement, which they received, was conditioned upon compliance with the Federal Anti-kickback Statute and the Stark Statute. In fact, the United States would not have made the payments to Kenner Regional and Memorial if defendants had revealed the underlying illegal kickback scheme which resulted in the services rendered, and for which Kenner Regional and Memorial submitted reimbursement forms that were paid by the United States.

97.    Upon information and belief, defendants possess records including, but not limited to, physician practice appraisals, physicians' productivity studies, and comparisons of physician compensation to practice net revenue, all of which reflect that the remuneration paid by Tenet was not financially justified except as an illegal conduit of kickbacks to obtain valuable but prohibited patient referrals.

98.    Upon information and belief, defendants possess records which demonstrate the significant resulting increases in patient referrals to Kenner Regional and Memorial by physicians induced to make prohibited patient referrals as a result of the transparently veiled kickbacks.

99.     The Medicare and Medicaid claims submitted by Kenner Regional and Memorial were "tainted" as the product of prohibited patient referrals fraudulently induced through improper financial relationships in violation of the fraud and abuse, anti-kickback and prohibited referral provisions of 42 U.S.C. §1320-7b(b) and 42 U.S.C. § 1395nn(a)(1), respectively.

100.    In addition, all claims filed with United States governmental agencies that failed to comport with the certifications contained in HCFA 2552 by Kenner Regional and Memorial to the United States constitute false certifications.

101.    Defendants presented or caused to be presented to the United States for payment the false claims referenced above.  Specifically, defendants knowingly, with actual knowledge of falsity and, at a minimum, in deliberate ignorance and reckless disregard of the truth or falsity of the information, caused and assisted in causing the United States to pay the false claims by submitting reimbursement forms to the United States and assisting and participating, in the illegal arrangement and the submittal of such forms.

102.    As a direct and proximate result of defendants' false statements and false or fraudulent cost report submissions, Medicare has been caused to pay monies to Kenner Regional and Memorial which they would not otherwise be entitled to receive which has also caused substantial damage to the integrity of the Medicare Program.  Defendants wrongfully obtained payments from Medicare which they knew they were not entitled to receive.  Defendants profited unlawfully from the payment of illegal remuneration to physicians and from the improper allocation of costs on their Hospital Cost Reports.

103.    Defendants' actions and conduct violates the fraud and abuse, anti-kickback and

-30-

prohibited referral provisions of 42 U.S.C. § 1320 7b(b) and 42 U.S.C. § 1395nn(a)(l), and each

of Defendants' "tainted claims" filed with agencies of the United States, including Medicare and

Medicaid, constitute separate violations of the FCA, 31 U.S.C. § 3729, *et. seq.*

## IX.    DAMAGES

104.    The United States was injured and suffered damages because of the acts of

defendants in submitting, causing to be submitted, or conspiring to submit false claims, in that it

paid defendants for items and services for which the defendants were not entitled to seek

reimbursement.  Had the United States been aware of the underlying violations by defendants,

such payments would not have been required to have been made by the United States and, in fact,

would not have been made.

### FIRST CAUSE OF ACTION
### (False Claims Act: Presentation of False Claims)
### (31 U.S.C. § 3729(a)(1))

105.    Plaintiff repeats and realleges Paragraphs 1 through 104 hereinabove as if fully

set forth herein.

106.    Defendants knowingly presented or caused to be presented false or fraudulent

claims for payment or approval to the United States.

107.    By virtue of the false or fraudulent claims made by defendants, the United

States suffered damages and therefore is entitled to statutory damages under the FCA, to be

determined at trial, plus civil penalties.

## SECOND CAUSE OF ACTION
### (False Claims Act: Making or Using False Record or Statement to Cause False Claim to be Presented)
### (31 U.S.C. § 3729(a)(2))

108.    Plaintiff repeats and realleges Paragraphs 1 through 107 hereinabove as if fully set forth herein.

109.    Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

110.    By virtue of the false records or false statements made by defendants in support of false or fraudulent claims, the United States suffered damages and therefore is entitled to statutory damages under the FCA, to be determined at trial, plus civil penalties.

## THIRD CAUSE OF ACTION
### (False Claims Act: Making or Using False Record or Statement to Avoid an Obligation to Refund)
### (31 U.S.C. § 3729(a)(7))

111.    Plaintiff repeats and realleges Paragraphs 1 through 110 hereinabove as if fully set forth herein.

112.    Defendants knowingly made, used or caused to be made or used false records or false statements to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States.

113.    By virtue of the false records or false statements made by defendants to avoid an obligation, the United States suffered damages and therefore is entitled to statutory damages under the FCA, to be determined at trial, plus civil penalties.

## FOURTH CAUSE OF ACTION
### (False Claims Act: Conspiring to Submit False Claims)
### (31 U.S.C. § 3729(a)(3))

114.    Plaintiff repeats and realleges Paragraphs 1 through 113 hereinabove as if fully set forth herein.

115.    Defendants entered into agreements with certain physicians and conspired to defraud the United States by submitting false or fraudulent claims for reimbursement from the United States for monies to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(3).

116.    By virtue of defendants' conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to statutory damages under the False Claims Act, to be determined at trial, plus civil penalties.

## PRAYER FOR RELIEF

WHEREFORE, relator, Greene, acting on behalf of an in the name of plaintiff, the United States, prays for judgment against defendants, jointly and severally, as follows:

A.    For an amount of not less than $5,000.00 and not more than $10,000.00 per false claim or act, plus three (3) times the amount of damages which the United States, sustained as a result of defendants' false and fraudulent claims or other violations of 31 U.S.C. § 3727, *et. seq.*;

B.    Plaintiff, United States, and relator, Greene, be awarded prejudgment and post-judgment interest, all court costs, related expenses and reasonable legal expenses, including, without limitation, attorney fees;

C.    Relator, Greene, be awarded a percentage of all such amounts awarded or collected on behalf of plaintiff, United States, against defendants in accordance with 31 U.S.C. § 3730; and

-33-



D.    For such other and additional relief as afforded by the False Claims Act and as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff, United States and relator Greene hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

SHARP HENRY CERNIGLIA COLVIN
WEAVER & HYMEL, L.L.C.

L. J. Hymel (Bar # 7137)
Michael Reese Davis (Bar # 17529)
Stephen H. Shapiro (Bar # 21076)
15171 S. Harrell's Ferry Road, Suite C
Baton Rouge, Louisiana 70816
Telephone: (225) 755-1060
Facsimile: (225) 755-1065

-AND-

BERGER SINGERMAN
Mitchell W. Berger
Florida Bar No. 311340
Leonard K. Samuels
Florida Bar No. 501610
Jeffrey S. Wertman
Florida Bar No. 003093
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, Florida 33301
Telephone:  (954) 525-9900
Facsimile:   (954) 523-2872

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA　　　　　　　C.A. No.
*EX. REL.* STEVEN J. GREENE

vs.　　　　　　　　　　　　　　　　　　　**FILED UNDER SEAL**
　　　　　　　　　　　　　　　　　　　　**PURSUANT TO 31 U.S.C.**
TENET HEALTHCARE CORPORATION,　　　**§ 3730(b)(2)**
KENNER REGIONAL MEDICAL CENTER, and
MEMORIAL MEDICAL CENTER

### *CERTIFICATION OF SERVICE*

I hereby certify that a copy of the Qui Tam Complaint for Damages under the False

Claims Act and Demand for Jury Trial was delivered to the United States Attorney's Office, 777

Florida Street, Suite 208, Baton Rouge, Louisiana 70801, and sent via certified or registered mail

to the Attorney General of the United States of Washington, D.C., this 27ᵗʰ day of August, 2003.

Respectfully submitted,

SHARP HENRY CERNIGLIA COLVIN
WEAVER & HYMEL, L.L.C.


L. J. Hymel (Bar # 7137)
Michael Reese Davis (Bar # 17529)
Stephen H. Shapiro (Bar # 21076)
15171 S. Harrell's Ferry Road, Suite C
Baton Rouge, Louisiana 70816
Telephone: (225) 755-1060
Facsimile: (225) 755-1065

-AND-

BERGER SINGERMAN
Mitchell W. Berger
Florida Bar No. 311340
Leonard K. Samuels
Florida Bar No. 501610
Jeffrey S. Wertman
Florida Bar No. 003093
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, Florida 33301
Telephone:  (954) 525-9900
Facsimile:  (954) 523-2872